## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LEVI YITZCHAK PILANT** and **ISSACHAR MANNE** | ) ) ) ) | |
| *Plaintiffs,* | ) ) | **Case No. 1:25-cv-55** |
| **v.** | ) ) | |
| **U.S. DEPARTMENT OF THE TREASURY; JANET L. YELLEN**, in her official capacity as Secretary of the Treasury; **U.S. DEPARTMENT OF STATE; ANTONY J. BLINKEN**, in his official capacity  as Secretary of State; **OFFICE OF  FOREIGN ASSETS  CONTROL; and LISA PALLUCONI**, in her official capacity as Director of the Office of Foreign Assets Control | ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

### COMPLAINT

Plaintiffs Levi Yitzchak Pilant ("Pilant") and Issachar Manne ("Manne") (collectively "Plaintiffs"), by and through undersigned counsel, hereby file this Complaint against Defendants U.S. Department of the Treasury, Janet L. Yellen (in her official capacity), U.S. Department of State, Anthony Blinken (in his official capacity), Office of Foreign Assets Control, and Lisa Palluconi (in her official capacity) for violations of Plaintiffs due process rights under the Fifth Amendment of the U.S. Constitution in applying Executive Order 14115, as well as Plaintiffs' rights under the Administrative Procedures Act ("APA"). Plaintiffs seek to recover attorney's fees, costs, and to obtain injunctive and declaratory relief.

### JURISDICTION AND VENUE

1. This Court has federal-question jurisdiction under 42 U.S.C. § 1988 and 28 U.S.C. § 1331 because this action arises under, inter alia, the U.S. Constitution.

2.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) & (e)(1). A substantial part of the events giving rise to this claim occurred in this district, and each Defendant is an officer of the United States sued in his or her official capacity.

### PARTIES - PLAINTIFFS

**Levi Yitzhak Pilant**

3.  Plaintiff Levi Yitzhak Pilant is a U.S. citizen who has nonetheless been sanctioned under EO 14115. His family is originally from Pittsburgh. He also has Israeli citizenship.

4.  Pilant's place of residence, Yitzhar, is an Israeli community located in Northern Samaria (or the West Bank)[1], south of the city of Nablus. The predominantly Orthodox Jewish community falls under the jurisdiction of Shomron Regional Council, an Israeli municipal body akin to a U.S. county. There are approximately 2,000 people who reside in Yitzhar.

5.  Pilant is a trained firefighter and Israel Defense Forces ("IDF") veteran. In 2013 his IDF superior officers asked him to become the head of security in Yitzhar, what is known in Hebrew as a *ravshatz* (the word *ravshatz*—plural *ravshatzim*—is an acronym for the Hebrew words *rakaz bitahon shotef tzahali*, meaning IDF coordinator of security). Pilant accepted this offer.

6.  A *ravshatz* is a civilian employed by the community but armed and specially trained by the IDF.

7.  A *ravshatz* is provided a mandate from the army which, in turn, authorizes him to exercise his/her security related duties.

---

[1] Judea and Samaria, also known as the "West Bank," has been the home of the Jewish People since biblical times. In modern times, the area was commonly described as Judea and Samaria (by United Nations documents, for example), until 1950, when the Hashemite Kingdom of Jordan sought to buttress its military occupation by renaming the area "West Bank." Plaintiffs oppose use of the term "West Bank," as that term makes no sense outside the context of Jordanian occupation, which ended in 1967. The term is also sometimes used to disparage the Jewish People's status as indigenous to the land. However, for ease of understanding and to mirror the language of EO 14115, Plaintiffs will use the term "West Bank" at certain intervals in this Complaint.

8.  A *ravshatz* is considered the community's first line of defense against Palestinian terror attacks and served a crucial and important role, for example, on the day of the October 7, 2023 massacre.

9.  Although a *ravshatz* is a civilian, he or she is subject to martial law and IDF courts.

10. On October 7, there were serious concerns that similar massacres were going to occur by Palestinian Arabs in the West Bank, as Hamas sought to open another front against Israel. On or around October 7, the Brigade Commander at the time, Avi Bloth, requested Pilant to remain in Yitzhar (as opposed to being called up into his regular reserve unit) as the commander of the "*Hagmar*" (regional defense unit, "RDU") unit of the Israeli Defense Forces, tasked with securing Yitzhar and preventing a similar Oct. 7 massacre. Since Oct. 7, Pilant has been the Captain of the RDU of Yizhar with approximately 60 reserve soldiers under his command. His duties are given to him directly by the army, and he is on leave from his civilian position. Throughout his tenure, Pilant has never been charged with a crime.

**ISSACHAR MANNE**

11. Plaintiff Issachar Manne is a U.S. citizen who has nonetheless been sanctioned under EO 14115. He is also an Israeli citizen.

12. In or around 2020, Manne established a farm in the South Hebron Hills, West Bank (Israel) on land leased from the World Zionist Organization, or in Hebrew the "Hativa L'hityashvut." The land where the farm is situated is all within the Ma'on community's municipal borders, known as the "blue line." This is land found by Israel, after administrative inquiry into its title status, to be state and/or public land (as opposed to private land). None of the land on Manne's farm is privately owned by Palestinians. The land, whether it be the land where the farm itself is located or the pasturing land surrounding the farm, is either specifically licensed to Manne for pasturing

and other farm-related activities, or is state land or what is known as "survey land," which is land whose status has not been fully legally determined.[2]

## PARTIES - DEFENDANTS

13. Defendant U.S. Department of the Treasury ("Treasury Department") is a federal agency responsible for implementing sections of EO 14115. The Treasury Department is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f).

14. Defendant Janet L. Yellen is the U.S. Secretary of the Treasury Department and was responsible for formulating the policy behind EO 14115 and, subsequently, implementing it in her capacity as the Secretary of the Treasury.

15. Defendant U.S. Department of State ("State Department") is a federal agency responsible for implementing EO 14115. The State Department is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f).

16. Defendant Antony Blinken is the U.S. Secretary of State and was responsible for formulating the policy behind EO 14115 and, subsequently, implementing it in his capacity as the Secretary of State.

17. Defendant Office of Foreign Assets Control ("OFAC") is a component of the Treasury Department and is responsible for implementing sections of EO 14115 pertaining to financial sanctions.

18. Defendant Lisa Palluconi is the current Director of OFAC.

---

[2] "Of the 5.5 million dunams (5,500 square kilometers or 2,120 square miles) – the entire territory of Judea and Samaria – about 123,000 dunams are privately owned Jewish land (purchased before 1948 or after 1967), 1.9 million dunams are state lands (registered as such in the Turkish land registry or declared state land by Israel) and 1.9 million dunams are unregistered land or privately owned Arab land. The rest is nature reserves and brush land of different types." https://myesha.org.il/?CategoryID=506&ArticleID=9641 (last accessed January 4, 2025).

# FACTS

## EO 14115

19. On February 1, 2024, President Biden issued EO 14115, which authorizes the imposition of, inter alia, financial sanctions on "foreign person[s]" who take actions that conflict with the Biden Administration's policy in the West Bank.

20. While EO 14115 defines a "United States person" as a "United States citizen, lawful permanent resident, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States," Sec. 7(d), it does not define the term "foreign person." However, OFAC has defined the term elsewhere, in different sanctions programs, as "any person that is not a U.S. person." 37 CFR §510.310; 31 CFR § 578.307. When an administration intends for the definition of "foreign person" to encompass U.S. citizens, it has done so explicitly. *See, e.g.*, 31 CFR § 590.305, 31 CFR §594.304.

21. EO 14115 was issued to combat alleged "high levels of extremist settler violence, forced displacement of people and villages, and property destruction" in the West Bank based upon the Administration's determination that "these actions constitute an unusual and extraordinary threat to the national security and foreign policy of the United States."

22. For purposes relevant here, EO 14115 permits the Secretary of State and Secretary of the Treasury, in consultation with one another, to initiate the blocking of U.S. held assets, or those held by U.S. persons, of anyone they deem involved in: "planning, ordering, otherwise directing, or participating in . . . an act of violence or threat of violence targeting civilians," EO 14115 (1)(a)(i)(B)(1), or "seizure or dispossession of property by private actors." EO 14115 1(a)(i)(B)(4).

23. EO 14115 was issued pursuant to the authority vested in the President under the U.S. Constitution and federal laws, which for purposes relevant here, include the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) ("IEEPA"), the National Emergencies Act (50 U.S.C. 1601 et seq.) ("NEA"), and section 301 of title 3, United States Code.

## The Discriminatory Application of EO 14115

24. Since EO 14115's promulgation, the only individuals who have been sanctioned are Jews.

25. In 2024 alone, there were 1,040 major Palestinian attempts on Jewish life: 689 firing attacks, 326 explosives, 13 stabbings, 9 driving attacks, 2 suicide attacks, and 1 kidnapping. There were 231 successful attacks resulting in 46 killed and 337 wounded.[3]

26. While serious Palestinian attacks on Jews in the West Bank persisted both before and after the issuing of EO 14115, the EO was made specifically upon a "find[ing] that the situation in the West Bank-in particular high levels of extremist settler violence . . . has reached intolerable levels." While the EO's enforcement provisions apply to any "foreign person" engaging in proscribed conduct, in practice the only individuals these provisions have been applied to are Jews, including Jews with U.S. citizenship like Plaintiffs, and not to any individual Palestinians or any other individuals of any other ethnic group. This is all the more striking because there are thousands of Palestinians who have engaged in terrorist attacks on Jewish civilians that unquestionably threaten the "peace, security, or stability of the West Bank." EO, §1(a)(i)(A).

27. On the same day EO 14115 was issued, the Financial Crimes Enforcement Network ("FinCEN"), a bureau within Defendant Treasury Department, issued a "FinCEN Alert" entitled "Alert on Israeli Extremist Settler Violence Against Palestinians in the West Bank" ("FinCEN Alert").[4]

---

[3] https://www.shabak.gov.il/media/1vadbtdc/sikum2024_low.pdf (last accessed on Jan. 4, 2025)
[4] FIN. CRIMES ENF'T NETWORK, FINCEN ALERT ON ISRAELI EXTREMIST SETTLER VIOLENCE AGAINST PALESTINIANS IN THE WEST BANK, FIN-2024-Alert001 (Feb. 1, 2024), https://bit.ly/3AbBlmR (last accessed on Jan. 4, 2025)

The FinCEN Alert begins with the following statement: "The Financial Crimes Enforcement Network (FinCEN) is issuing this alert to financial institutions related to the financing of Israeli extremist settler violence against Palestinians in the West Bank."

28. FinCEN's "Alert on Israeli Extremist Settler Violence Against Palestinians in the West Bank" does not even attempt to conceal the fact that the EO and its implementation are aimed at the Jewish people and only the Jewish people. The Alert addresses only "Israeli" individuals and entities with no reference to any other nationality. In instructing financial institutions concerning the EO's sanction regime, FinCEN listed potential "red flag indicators" that can assist a financial institution to identify "suspicious activity related to the financing of Israeli extremist settler violence against Palestinians in the West Bank":

> (a) Payments to any organizations or groups, including nonprofit organizations . . . linked to *Israeli* violent extremist groups in the West Bank.
>
> (b) Information included in a transaction between customers, such as references in the memo field, that indicate support for *Israeli* violent extremist groups or campaigns.
>
> (c) Transactions with no apparent economic, business, or lawful purpose associated with a rapid movement of funds and linked to NPOs active in supporting violent extremist *Israeli* settlers in the West Bank, particularly if the NPO has advocated for, or solicited donations on social media in support of, *Israeli* violent extremist groups or campaigns. (emphasis added).[5]

29. While the Administration has sanctioned a Palestinian terrorist *group* called the "Lion's Den" under the EO, it has not sanctioned a single Palestinian or non-Jewish *individual*. Notably, the Lion's Den has been largely dormant for over a year, and has no known bank accounts, so no actual asset freezes appear to have resulted from the action.

---

[5] *Id.*

30. In short, despite the EO's facially neutral language, the Administration has made clear by its words and actions that only Jewish individuals are at risk of being sanctioned under EO 14115, and that despite its neutral language, the order is targeted at them. This creates a clear denial of Equal Protection to American citizens in the West Bank.

**The Sanctioning of Plaintiff Pilant**

31. On August 28, 2024, pursuant to Section (1)(a)(i)(B)(1) of the EO, the State Department announced it was "sanctioning Yitzhak Levi Filant (Filant) [sic], the civilian security coordinator of the Yitzhar settlement in the West Bank. Although Filant's [sic] role is akin to a security or law enforcement officer, he has engaged in malign activities outside the scope of his authority. In February 2024, he led a group of armed settlers to set up roadblocks and conduct patrols to pursue and attack Palestinians in their lands and forcefully expel them from their lands."

32. The State Department's accusations are entirely false and appear to be based on a "comprehensive dossier" submitted just a few days prior to the sanctioning by Democracy for Arab World Now ("DAWN"), an organization whose board members have ties to the extremist Muslim Brotherhood and have praised Hamas,[6] and which failed to even get Plaintiff Pilant's last name right. A DAWN summary noting the dossier erroneously re-links to the summary itself, rather than the actual dossier, but the summary falsely notes:

> Filant [sic] plays a central role in orchestrating violence against civilians in nearby Palestinian villages. Human rights groups, Israeli and Palestinian media, and eyewitnesses have documented over a dozen incidents of Filant's [sic] participation and leadership in violent assaults, shootings, threats at gunpoint, arson, and property destruction targeting Palestinian civilians between October 2019 and February 2024. In these incidents, Filant [sic] has either personally conducted or directed settler and military violence against Palestinian civilians, and in particular, those engaging in agriculture in the area. Most recently, on February 17, 2024, Filant [sic] and other settlers set up a makeshift roadblock outside the village of Asira al-Qibliya and forcibly removed three Palestinian civilians from a car, assaulted them, and threatened to burn the vehicle if they returned. As a security leader of the settlement, Filant [sic] also has failed to prevent,

---

[6] https://ngo-monitor.org/reports/dawn-lawfare/ (last accessed Jan. 4, 2025)

discourage, condemn, or stop other settlers from carrying out violence and threats of violence against Palestinians and their property.[7]

33. As noted and acknowledged by the State Department, Pilant is a bona fide security official of the Israel government authorized to counter threats to the safety of Israeli citizens. As an initial matter, contrary to DAWN's suggestion that Pilant was acting in a civilian capacity "[a]s Yitzhar's Civilian Security Officer," Pilant was in active army service on this date and organizing patrols and roadblocks were a basic part of the mission.

34. The threats to Jews in Yitzhar are manyfold, including but not limited to attempted or actualized shootings, rock throwing, arson, kidnapping, and theft. Before Oct. 7, security related events occurred 2-6 times a week. Oct. 7th made the possibility of such attacks on West Bank communities even more likely. However, as a result of the IDF's vigilant patrolling and operations, terror attacks in the months after Oct. 7th were reduced significantly from prior levels, though they still remained shockingly high. For example, in the three months after Oct. 7th, there were 101 significant terror attacks in the Northern West Bank alone (where Yitzhar is located), almost all of them shootings.[8]

35. Pilant's position as head of security and RDU Captain of Yitzhar requires him to be armed and also entails his command over dozens of subordinates. In carrying out his official duties to combat Palestinian terrorism and as instructed by his superior officers, on February 17, 2024, Pilant set up roadblocks in order to prevent the smuggling of ammunition and terrorists. These roadblocks were authorized by the IDF, the maintenance of which was a formal part of Pilant's duties.

---

[7]https://dawnmena.org/us-sanction-israeli-mk-sukkot-security-officer-yitzhak-filant-and-yitzhar-settlement-leadership-for-promoting-violence-against-palestinian-civilians/ (last accessed on Jan. 4, 2025),
[8]https://www.washingtoninstitute.org/policy-analysis/second-palestinian-front-relative-quiet-restlessness-and-waiting (last accessed on Jan. 4, 2025).

36. Pilant has never engaged in violence against Palestinians at any time. At times, he or his soldiers request Palestinians to get out of their vehicle for inspection, a standard IDF practice, as the State Department is aware,[9] and which the U.S. has never claimed constitutes 'violence'. All this was done non-violently and strictly in accordance with his RDU or IDF mandate to ensure the safety of Yitzhar's civilians.

37. Pilant and his soldiers are also tasked with preventing Palestinians from entering a defined perimeter surrounding the community. The perimeter is not defined or determined by Pilant, but rather by commanding officers at the IDF. At times, if a Palestinian enters these restricted areas, Pilant is charged with instructing them to leave. Palestinians are also permitted to seek special permission to enter these restricted perimeters from the IDF. The State Department has never claimed these restricted zones are illegal.

38. As Captain of the RDU and also, as a civilian *ravshatz*, Pilant is also tasked with preventing violence by Jews against Palestinians. Pilant has and continues to carry out this duty. For example, after a Palestinian terror attack, some Israelis from Yitzhar or other neighboring communities may want to take the law into their own hands. Pilant is the one tasked with preventing that from happening and as such he often finds himself in the midst of confrontations between Israeli and Palestinian groups, attempting to separate the two and to restore law and order.

39. At no time prior to sanctioning did any U.S. governmental entity or representative provide Pilant with notice and hearing on this matter.

---

[9] *See, e.g.*,
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/israel-west-bank-and-gaza-travel-advisory.html (last accessed Jan. 4, 2025).

40. Had Pilant been given notice and hearing, he would have demonstrated that the allegation that he led "a group of armed settlers to set up roadblocks and conduct patrols to pursue and attack Palestinians in their lands and forcefully expel them from their lands" is false.

41. Upon information and belief, the sanctioning of Pilant marked the first time the U.S. government sanctioned an active duty IDF officer under EO 14115 for lawful actions pursuant to his lawful orders. The State Department has never publicly challenged the lawfulness or legitimacy of these orders, which in the months after Oct. 7th were crucial to preventing similar attacks from happening in the West Bank.[10]

42. As a result of the sanctions, Pilant's bank account and credit cards are frozen, he is unable to make mortgage payments, and he has suffered severe harm to his finances and his reputation.

**The Sanctioning of Plaintiff Manne**

43. On July 11, 2024, the State Department announced that Manne was "being designated pursuant to section 1(a)(i)(B)(1) of E.O. 14115 for being a foreign person who is responsible for or complicit in, or for having directly or indirectly engaged or attempted to engage in planning, ordering, otherwise directing, or participating in an act of violence or threat of violence targeting civilians, affecting the West Bank; and pursuant to section 1(a)(i)(B)(4) for being responsible for or complicit in, or for having directly or indirectly engaged or attempted to engage in planning, ordering, otherwise directing, or participating in seizure or dispossession of property by private actors, affecting the West Bank."[11]

44. The State Department further sanctioned the "Manne Farm Outpost" "pursuant to section 1(a)(iv) of E.O. 14115 for being owned or controlled by, or for having acted or purported to act for or on

---

[10] *See, e.g.,*
https://www.i24news.tv/en/news/analysis-opinion/artc-a-year-after-oct-7-israelis-in-west-bank-fear-history-could-re
peat-itself; https://www.ynetnews.com/article/h1xkqovha (last accessed Jan. 4, 2025).
[11] https://www.state.gov/designation-of-individuals-and-entities-contributing-to-violence-and-instability-in-the-west-
bank/ (last accessed Jan. 4, 2025)

behalf of, directly or indirectly, MANNE; and pursuant to section 1(a)(i)(B)(4) for being responsible for or complicit in, or for having directly or indirectly engaged or attempted to engage in planning, ordering, otherwise directing, or participating in seizure or dispossession of property by private actors, affecting the West Bank."[12]

45. The State Department claimed "MANNE founded and established MANNE FARM OUTPOST in the South Hebron Hills in 2020 after seizing 150 hectares of land, this number has nearly doubled. MANNE FARM OUTPOST was established on pastureland belonging to the Palestinian community, and settlers from this outpost regularly attack community shepherds and prevent their access to pastureland through acts of violence."

46. In apparent reliance on the U.S. sanctions against Manne, other countries and political entities have followed suit, including but not necessarily limited to the European Union.[13]

47. To date, neither the State Department nor any other organ of the U.S. government has explained what "pastureland belonging to the Palestinian community" means or has identified which purported members or organizations of the "Palestinian community" have ownership over the land in question.

48. Manne has never appropriated, nor has he sought to appropriate, land under private Palestinian ownership or otherwise designated by the Israeli government as private or restricted. He has a general policy to graze his herd (approximately 130 sheep) in areas that are *not* owned by private individuals, be it Israelis or Palestinians, relying on maps given to him by the Israeli authorities to ensure compliance. To the extent that he utilizes private property, he rents land owned by the Settlement Division of the World Zionist Ownership, and therefore any private land he utilizes is owned not by Palestinians but by a Jewish organization to which he pays rent.

---

[12] *Id.*
[13] https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=OJ:L_202401967 (last accessed Jan. 4, 2025).

49. There have been numerous specious criminal complaints lodged against Manne since his establishment of his farm. These complaints falsely allege acts such as assault and trespass. In reality, these complaints are submitted to the police by Palestinians or, for the most part, left-wing extremists who arrive in close proximity to the farm/pasture area and instigate Palestinian farmers against Manne, film the incident, and then file false complaints to police. Importantly, while the relevant Israeli authorities dutifully investigate the complaints against Manne, he has never been arrested and no complaint has ever led to criminal charges or an indictment. Most complaints are closed for lack of evidence or because the activity alleged to have occurred is not criminal.

50. Manne has never engaged in violence against Palestinians, even against those who have trespassed onto land he is authorized to use. When a trespass does occur or when Manne feels threatened, Manne defers to the Israeli authorities to deal with the matter, either the police or the IDF depending on the situation.

51. At no time prior to sanctioning did any U.S. governmental entity or representative provide Manne with notice and hearing on this matter. Had he been given notice and hearing, Manne would have clearly demonstrated that the allegations against him are false.

52. Upon information and belief, in sanctioning Manne, the Administration relied on a publication that does not even accuse Manne himself of violence or appropriating land privately held by Palestinians or under the administration of a lawful Palestinian political entity. For example, a November 2021 report by *B'Tselem*, an extremist left-wing organization, noted that "[v]iolence by settlers from the farm has significantly limited the pastureland[14] used by local Palestinian shepherds."[15] In making this assertion, *B'Tselem* failed to actually identify any of these allegedly violent settlers, describe their exact relationship to Manne and his operation, and most

---

[14] The term "pastureland" is not a commonly used term in English and appears in the State Department's announcement of sanctions, suggesting the State Department relied on this report in sanctioning Manne.

[15] See https://www.btselem.org/sites/default/files/publications/202111_state_business_eng.pdf at 13 (last accessed Jan. 4, 2025).

importantly, implicate Manne himself in any acts of violence or trespass onto Palestinian land. In fact, the *B'Tselem* report never even makes the claim, contrary to the State Department's assertion, that Manne or any of his affiliates have appropriated land owned by Palestinians.

53. As a result of the sanctions, Manne has had his bank account and credit cards frozen, he is unable to make mortgage payments, and he has suffered from harm to his finances and reputation.

## CAUSES OF ACTION

### COUNT I
**Violation of the Fifth Amendment of the U.S. Constitution in applying EO 14115**
**Due Process Violation**
**(against all Defendants)**

54. Plaintiffs replead all of the foregoing paragraphs as if they were stated fully herein.

55. The Fifth Amendment of the U.S. Constitution states "no person shall. . . be deprived of life, liberty, or property, without due process of law."

56. The Defendants applied EO 14115—a sanctions regime limited to "foreign person[s]" — to U.S. Citizen plaintiffs. Nothing in EO 14115 or any implementing regulations defines the term "foreign person" to include U.S. citizens.

57. In sanctioning Plaintiffs, Defendants have deprived them of a life interest by, inter alia, penalizing them for defending their lives against Palestinian terrorists; a liberty interest by, inter alia, severely restricting with whom they can conduct business and financial transactions; and a property interest by causing their financial accounts and lines of credit to be frozen.

58. There was no statutory or other lawful basis to sanction Plaintiffs under EO 14115, and absent such a lawful basis, the Defendants' deprivation of their aforestated interest violated their right to Due Process under the Fifth Amendment.

59. Additionally, Defendants failed to perform any basic fact-finding prior to implementing and enforcing the EO in such a one-sided and draconian manner. This lack of fact-finding is

evidenced by the fact that the Administration even misspelled Plaintiff Pilant's name identical to the misspelling found in reports drafted by DAWN, an organization with dubious antisemitic leadership.

60. As a direct and proximate result of Defendants' actions, Plaintiffs experienced considerable financial loss, emotional distress, harm to reputation, humiliation, and embarrassment.

**COUNT II**
**Violation of the Fifth Amendment of the U.S. Constitution in applying EO 14115**
**Due Process: Failure to Give Fair Warning; Vagueness**
**(against all Defendants)**

61. Plaintiffs replead all of the foregoing paragraphs as if they were stated fully herein.

62. As noted by the Supreme Court, "the notion that persons have a right to fair warning of that conduct which will give rise to [ ] penalties - is fundamental to our concept of constitutional liberty . . . As such, that right is protected . . . by the Due Process Clause of the Fifth Amendment." *Marks v. United States*, 430 U.S. 188, 191-92, 97 S. Ct. 990, 992-93 (1977).

63. EO 14115 creates a sanctions regime for "foreign person[s]" and foreign persons only. EO 14115 fails to give any indication that this sanctions regime may be applied to U.S. citizens, including those like Plaintiffs who incidentally and additionally hold foreign citizenship. The term "foreign" is not ordinarily attached to U.S. citizens. To the extent that the term "foreign" may conceivably attach to a U.S. citizen, in the absence of any regulations specifying this, EO 14115 is unconstitutionally vague.

64. The Supreme Court has "insist[ed] that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298-99 (1972). Here, a person of ordinary intelligence is deprived of a reasonable opportunity to know if the conduct made sanctionable by EO 14115 is prohibited if performed by

a U.S. citizen. To the extent that a U.S. citizen may ever be considered a "foreign person," that term alone provides no such indication—in fact suggesting the opposite—and no other text in the executive order adds additional clarity on this point.

65. As a direct and proximate result of Defendants' actions, Plaintiffs experienced considerable financial loss, emotional distress, harm to reputation, humiliation, and embarrassment.

**COUNT III**
**Violation of the Fifth Amendment of the U.S. Constitution in applying EO 14115**
**Due Process: Failure to Give Notice and Hearing**
**(against all Defendants)**

66. Plaintiffs replead all of the foregoing paragraphs as if they were stated fully herein.

67. As noted by the Supreme Court "[t]he constitutional guarantee of procedural due process applies to governmental deprivation of a legitimate 'property' or 'liberty' interest within the meaning of the Fifth or Fourteenth Amendment. It requires that any such deprivation be accompanied by minimum procedural safeguards, including some form of notice and a hearing." *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 624, 94 S. Ct. 1895, 1908 (1974).

68. Plaintiffs are U.S. citizens who, when the Administration applied EO 14115 to them, were subjected to a governmental deprivation of legitimate life, liberty, and property interests, including but not limited to defending their lives against terrorism, transacting business with others, and financial interests in the form of bank account funds and lines of credit. This deprivation was not accompanied with any form of notice and hearing.

69. Had Plaintiffs been notified of the intention of the Defendants to impose sanctions and been given an opportunity for an impartial hearing, they would have been able to clearly demonstrate how the allegations against them are completely false and lack support or evidence.

70. As a direct and proximate result of Defendants' actions, Plaintiffs experienced considerable financial loss, emotional distress, harm to reputation, humiliation, and embarrassment.

**COUNT IV**

**Violation of the Fifth Amendment of the U.S. Constitution in applying EO 14115**
**Due Process: Equal Protection**
**(against all Defendants)**

71. Plaintiffs replead all of the foregoing paragraphs as if they were stated fully herein.

72. The Fifth Amendment's Due Process Clause includes an equal protection component. *United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws.").

73. Government action that implicates an equal protection right will be subject to strict scrutiny if the action targets a suspect class (like race or alienage) or burdens the exercise of a fundamental right.

74. The application of EO 14115 to Plaintiffs is subject to strict scrutiny because they were sanctioned in a broader context whereby only Jewish and/or Israeli individuals are being sanctioned under the EO, despite a sanctions regime that is ostensibly race, religion, and national origin neutral in that it applies to all relevant "foreign person[s]." While a single Palestinian organization has been sanctioned, that organization has been dormant for a year and not a single Palestinian individual—or indeed any individuals other than Jews—have been sanctioned.

75. In addition, under *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), a prima facie race-neutral law "administered by public authority with an evil eye and an unequal hand" infringes upon the right to equal protection. *Id.* at 373–74. Here, in sanctioning Plaintiff Pilant, the Administration has looked upon him through the "evil eye" of DAWN, an organization with leaders who have expressed affinity for those seeking Israel's destruction.

76. More broadly, the EO has the effect of treating American Jews enforcing Israeli property law and land use law against Palestinians as inherently wrongful; it views Jews defending their property and/or their lives against Palestinian theft/terrorism as wrongful; and it views Jewish assertion and public promotion of property rights within the West Bank as wrongful. As made clear by the State Department's announcement of sanctions against Manne, the Administration assesses ownership of land and grazing rights in the West Bank through the lens of ethnicity, accusing him of utilizing land "belonging to the Palestinian community." As noted, the reports falsely accusing Manne of wrongdoing do not even indicate the land is privately owned by Palestinians or a bona fide Palestinian political entity or group. The Administration, however, has unilaterally determined that only one "community" at the expense of the other can claim rights to land and land use in the West Bank. When the government denies American citizens of a Jewish background property rights and subjects them to governmental sanctions, this is a violation of equal protection.

77. As a direct and proximate result of Defendants' actions, Plaintiffs experienced considerable financial loss, emotional distress, harm to reputation, humiliation, and embarrassment.

## COUNT V
### Violation of Plaintiffs' Rights under the Administrative Procedure Act 5 U.S.C. § 500, *et seq.*

78. Plaintiffs replead all of the foregoing paragraphs as if they were stated fully herein.

79. The IEEPA authorizes the President to declare the existence of an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States" that originates "in whole or substantial part outside the United States." 50 U.S.C. §1701(a). It further authorizes the President, after such a declaration, to block transactions and freeze assets to deal with the threat. Section 1701(b) states that:

the authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose.

80. The number of incidents referred to in the preamble of the EO is negligible compared with the number of terrorist attacks that have been committed by Palestinians against Jewish residents of the region.

81. Under the APA, a court must "hold unlawful and set aside" agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C. § 706(2)(A)), "contrary to constitutional right, power, privilege, or immunity" (5 U.S.C. § 706(2)(B)), or "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C).

82. Defendants' implementation of Section 1 of the EO is arbitrary and capricious because there is no evidence that Jewish-Israeli settler violence is a threat to the stability of the West Bank or a threat to U.S. national security. Moreover, the arbitrary and capricious nature of OFAC's determination of which entities to place on the Specially Designated Nationals List in implementing the EO is further demonstrated by the fact that OFAC has exclusively targeted individuals who are Israeli Jews, despite the overwhelming evidence that Israeli Jews in Judea and Samaria pose no threat to stability or peace.

83. The arbitrary and capricious nature of OFAC's determinations is further buttressed by the fact that not a single Muslim or Arab individual has been sanctioned under EO 14115, despite the dozens of attempted and completed terror attacks in the West Bank.

84. Defendants failed to perform any basic fact-finding prior to implementing and enforcing the EO in such a one-sided and draconian manner. This lack of fact-finding is evidenced by the fact that

the Administration even misspelled Plaintiff Pilant's name identical to the misspelling found in reports drafted by DAWN, an organization with dubious antisemitic leadership.

85. As a direct and proximate result of Defendants' actions, Plaintiffs experienced considerable financial loss, emotional distress, harm to reputation, humiliation, and embarrassment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a) issue an order vacating Defendants' designation of Plaintiffs under EO 14115 or otherwise order Defendants to rescind their designations;

b) issue an order requiring the Administration to inform all foreign countries that have sanctioned Plaintiffs that their sanctions in the United States have been rescinded and that the sanctions were issued without an adequate legal and factual basis;

c) declare that Defendants' enforcement of EO 14115 against Plaintiffs violates the Fifth Amendment to the United States Constitution;

d) declare that EO 14115 cannot be a basis for sanctions against U.S. citizens like Plaintiffs because a U.S. citizen is not a "foreign person";

e) Grant the appropriate attorneys' fees and litigation costs pursuant but not limited to the Equal Access to Justice Act, 28 U.S.C. §2412(b); and

f) grant such other and further relief as the Court may deem just and proper.

Date: January 9, 2025                           Respectfully submitted,

                                                 /s/  *Matthew Mainen*
                                                Matthew Mainen
                                                D.D.C. Bar #: MD0200
                                                National Jewish Advocacy Center, Inc.
                                                666 Harless Place
                                                West Hempstead, NY 11552
                                                Phone:  (301) 814-9007
                                                Email: matt@njaclaw.org

_/s/ Mark Goldfeder_
Mark Goldfeder
D.D.C. Bar # NY0273
National Jewish Advocacy Center, Inc.
666 Harless Place
West Hempstead, NY 11552
Email: mark@njaclaw.org

_/s/Jerome M. Marcus_
Jerome M. Marcus*
Marcus & Marcus
P.O. Box 212, Merion Station, PA  19066
Voice:  610.664.1184
FAX:  610.664.1559
Email: jmarcus@marcuslaw.us

_/s/ L. Marc Zell_
L. Marc Zell
D.D.C. Bar # 959437
ZELL, ARON & CO.
34 Ben Yehuda St.
14th Floor
Jerusalem, Israel 9423001
011-972-2-633-6300
Email:  mzell@fandz.com

_/s/ Ben Schlager_
Ben Schlager (pro hac vice forthcoming)*
National Jewish Advocacy Center, Inc.
666 Harless Place
West Hempstead, NY  11552
Phone: (917) 495-5790
Email: ben@NJAClaw.com

_/s/ Noam Schreiber_
Noam Schreiber*
ZELL, ARON & CO.
DC BAR # 90020231
34 Ben Yehuda St.
14th Floor
Jerusalem, Israel 9423001
011-972-2-633-6300
Email: noam.schreiber@fandz.com

* Not barred in D.D.C.